UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Derrick John Thompson,<br><br>Defendant. | Case No. 23-cr-358 (JMB/TNL)<br><br><br>REPORT & RECOMMENDATION |

Ruth Shnider and Thomas Calhoun-Lopez, Assistant United States Attorneys, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Aaron J. Morrison, Federal Public Defender, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Defendant).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Derrick John Thompson's Motion to Dismiss Count Two, ECF No. 23, Motion to Suppress Evidence of Identification, ECF No. 25, and Motion to Suppress Statements, ECF No. 26. These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Jeffrey M. Bryan, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on February 7, 2024. ECF No. 33. Assistant United States Attorney Ruth Shnider appeared on behalf of the United States of America (the

1

"Government"). Federal Defender Aaron Morrison appeared on behalf of Defendant Derrick John Thompson ("Defendant"). These motions are ripe for determination by the Court.

## II. FINDINGS

The Court heard testimony from Sergeant Ligneel. *See id.* The Government offered, and the Court received, *id*, the following exhibits: Government's Exhibit 1, Sgt. Stewart BWC clip (6/16/23 at 22:17); Government's Exhibit 2, Sgt. Stewart BWC clip (6/16/23 at 22:29); Government's Exhibit 3, Officer Bady BWC clip (6/16/23 at 22:40); Government's Exhibit 4, squad video composite of show-up (6/16/23); Government's Exhibit 5, Officer Damon BWC clip (6/16/23 at 22:45); Government's Exhibit 6, Sgt. Ligneel BWC clip (6/17/23 at 00:15).[1] Based upon the files and documents contained therein, along with the testimony and exhibits presented, the undersigned makes the following findings.

Sergeant Ligneel has been in law enforcement for 29 years and is currently a sergeant with the robbery unit for the Minneapolis Police Department and a task force officer with the Federal Bureau of Investigation. Tr. 12:4-8. Sergeant Ligneel was one of the lead investigators on Defendant's case. Tr. 12:9-11. On the night of June 16, 2023, Sergeant Ligneel was on call for the homicide unit when he received a call from the homicide division informing him of a fatal traffic accident. Tr. 12:18-24. Sergeant Ligneel learned that prior to the fatal accident, a trooper with the Minnesota state patrol observed a vehicle traveling over the speed limit on a highway and once the trooper was set to pull

---

[1] At the hearing, the Court granted the Government's request to seal Exhibits 1 through 6. *Id.*

over the vehicle, the vehicle accelerated in speed, weaving in and out of traffic lanes, ultimately taking the off-ramp to Lake Street in Minneapolis. Tr. 13:2-9. Sergeant Ligneel also understood that once the vehicle exited the highway it proceeded to run a red light and then ran a second red light at Second Street and East Lake Street resulting in the fatal crash. Tr. 13:9-12. The vehicle crashed into a small-four door sedan, killing the five women inside. Tr.12:21-24; 13:9-14. The crash occurred at 10:16 p.m. Tr. 23:1. The vehicle was later searched by law enforcement recovering a firearm, fentanyl, cocaine, and ecstasy. Tr. 13:18-14:1.

Shortly after the fatal crash, an eyewitness gave a statement to Sergeant Stewart. Tr. 17:12-20; *see* Gov't's Ex. 1. The witness told Sergeant Stewart that she believed she saw the driver of the vehicle run away from the fatal crash. Tr. 18:2-5; *see id.* She provided a description of the driver to Sergeant Stewart, describing the driver as a black male to be about 6'2" in height, wearing a white t-shirt, gray skull cap, gray-green sweatpants and was limping. Tr. 18:6-9; *see id.* This description was aired over the police radio and shortly thereafter an individual who matched the witness's description was located at a nearby Taco Bell, about a block and a half away from the site of the crash. Tr. 14:15-15:3; 18:10-13. Law enforcement observed the individual (later identified as Defendant) to be sweating profusely with an injury on his forehead. Tr. 15:4-5; 18:10-15. Defendant was not wearing a hat, like the witness had described. Tr. 18:6-9; 21:10-18.

At about 10:30 p.m., Sergeant Stewart returned to the witness's home and informed her, "we have a guy stopped at the Taco Bell that we think—that may or may not be involved." Tr. 18:16-19:2; *see* Gov't's Ex. 2. Sergeant Stewart asked the witness "would

3

you be willing to come look at him?" to which the witness agreed. Tr. 18:16-19:2; *see id.* Roughly ten minutes later, while Officer Bady was escorting the witness to the show-up, he informed her that "we may or may not have someone in the back of the squad car that you may recognize." Tr. 19:3-25; *see* Gov't's Ex. 3. Officer Bady instructed the witness to give a yes or no response to whether she recognized the individual. Gov't's Ex. 3. The witness was placed in the back of a squad car and driven to where the show-up identification was set to occur. *Id.* Before the show-up, another officer asked Officer Bady in the presence of the witness, "so did you already let [the witness] know this may or may not be the person." *Id.* Officer Bady responded with an affirmative "yes." *Id.* The witness can also be heard responding, "okay." Gov't's Ex. 4. Officer Bady then repeated to the witness that all she needed to do for the show-up identification was offer a yes or no response to whether she recognized the individual. Gov't's Ex. 3.

    A few minutes before the start of the show-up at around 10:47 p.m., Officer Bady told the witness, "Ma'am so we're gonna bring out the suspect—possible suspect—I want you to tell me if you recognize him or not." Tr. 22:19-23:5; *see* Gov't's Ex. 3. Another officer can be heard interjecting to say, "possible suspect." Gov't's Ex. 3. At this time, Defendant was detained in the back of a squad car, and he was handcuffed. *See* Gov't's Ex. 4. The squad car Defendant was detained in was located a short distance from the squad car holding the witness. *Id.* Three officers removed Defendant from the back of the squad car and walked with him to the front of the squad car holding the witness. *Id.*; *see also* Gov't's Ex. 5. Lights from the squad car in which the witness sat illuminated Defendant for the witness. Gov't's Ex. 4.

Defendant stood between the officers and remained handcuffed throughout the duration of the show-up identification. *Id.* While Defendant was facing the squad car with the witness, Officer Bady asked the witness, "do you recognize them?" *Id.* The witness responded, "gray like sweatpants on and white t-shirt, yep." *Id.* Officer Bady informed the witness that he could not hear her. *Id.* The witness responded again with, "yes." *Id.* Officer Bady again asked the witness, "do you recognize him yes or no." *Id.* This time the witness responded with, "yes, well it was dark, but he had a t-shirt on like that and gray and green sweatpants." *Id.* Officer Bady asked the witness to give a yes or no answer. *Id.* This time she responded with only a "yes." *Id.* Another officer asked the witness whether she recognized him. *Id.* The witness responded, "that's the one I seen running through my neighbor's driveway, yes, I mean my neighbor's yard." *Id.* The witness was asked, "from where?" She responded, "from the crash." *Id.* When asked again whether the person was the individual she saw running from the crash, the witness responded, "similar, yes." *Id.* The witness can be heard asking whether the individual had a limp and as Defendant was being returned to the squad car, he displayed a limp. *Id.* After observing the individual limp, the witness stated, "see? He can't walk." *Id.* An officer then asked whether she "100 percent saw him running from the crash" to which she responded, "yes." *Id.* The show-up concluded shortly after. *Id.*

A few hours later at approximately midnight, the witness provided Sergeant Ligneel with a detailed statement. Tr. 23:3-10; *see* Gov't's Ex. 6. The witness explained that earlier in the night (before the fatal crash) she let her dog outside of her house and went to get her mail when she heard a loud screeching noise and a loud boom. *See* Gov't's Ex. 6. She then

saw a vehicle tumbling out in front of her. *Id.* She further explained that although she did not observe the person climb out of the vehicle, she could tell he was leaving the vehicle that crashed into the sedan and she only observed one person leaving that vehicle. *Id.* The witness stated that this person was wearing a white t-shirt, gray-green sweatpants, and a gray beanie cap. *Id.* She also described the person as a black male, 6 plus feet tall, medium build, with shoulder length dreadlocks. *Id.*

The witness explained that after she saw the male leave the vehicle, she brought her dog inside her house through her front door and went back out to her deck to lock her back door when she observed the male running alongside her neighbor's fence and out through the back alley towards the Taco Bell. *Id.*; Tr. 23:11-24:1. The witness demonstrated for Sergeant Ligneel and another officer where exactly she was on her deck when she observed the male run alongside her neighbor's fence. *Id.*; Tr. 23:14-24:5. Sergeant Ligneel asked the witness about the show-up that took place earlier that night. *See* Gov't's Ex. 6. In response, the witness stated that the person she was shown earlier had looked like the male who she observed running from the fatal crash. *Id.* She informed Sergeant Ligneel that when she first observed the male he was limping and while she was participating in the show-up identification she also observed Defendant limping. *Id.* She also stated that Defendant had the same appearance and clothes as the person she saw running away from the fatal crash. *Id.* As a result of the show-up identification, Defendant was arrested and later charged in a three-count Indictment on December 5, 2023. *See generally* ECF No. 8.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned makes the following conclusions of law.

### A. Motion to Dismiss Count Two of the Indictment

Defendant moves to dismiss Count Two of the Indictment, arguing that 18 U.S.C. § 922(g)(1), is unconstitutional under the Second Amendment in light of the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). ECF No. 23 at 1. Count Two of the Indictment charges Defendant with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). *See* ECF No. 8 at 1-2. Defendant acknowledges that his constitutional challenge is foreclosed by binding Eighth Circuit precedent. *Id.* Nevertheless, Defendant brought this motion to preserve the issue for later review. *Id.* The Government opposes this motion. Gov't's Resp. at 3, ECF No. 27.

Defendant's challenge is foreclosed by binding precedent and therefore this motion should be denied. The Eighth Circuit in *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023), ruled that § 922(g)(1) is constitutional even after the Supreme Court's decision in *Bruen*. In coming to its holding, the Eighth Circuit highlighted the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), which recognized that an individual right to keep and bear arms should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Jackson*, 69 F.4th at 501 (quoting *Heller*, 554 U.S. at 626). Turning next to *Bruen*, the Eighth Circuit explained that *Bruen* similarly found that the right to keep and bear arms "is 'subject to certain reasonable, well-

defined restrictions'" that "do not disturb or cast doubt on the prohibitions." *Id.* at 502 (quoting *Bruen*, 142 S. Ct. at 2156-57). From there the Eighth Circuit reasoned that "[g]iven these assurances by the Supreme Court, and the history that supports them, [the Eighth Circuit] conclude[s] that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)." *Jackson*, 69 F.4th at 502. Moreover, after analyzing the historical prohibitions on the right to possess a firearm, the Eighth Circuit in *Jackson* held that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons." *Id.* at 505. Further holding that "[c]onsistent with the Supreme Court's assurances that recent decisions on the Second Amendment cast no doubt on the constitutionality of laws prohibiting the possession of firearms by felons." *Id.* at 505-506. Likewise, following *Jackson*, the Eighth Circuit clarified and held in *United States v. Cunningham*, 70 F.4th 502, 506 (8th Cir. 2023) that "[t]he longstanding prohibition on possession of firearms by felons is constitutional." The Eighth Circuit reaffirmed the constitutionality of § 922(g)(1) in *United States v. Dunn*, 76 F.4th 1062, 1068 (8th Cir. 2023), when it held that "this court concluded that the felon-in-possession statute is constitutional." *Id.*

The Court is bound to apply the precedent of the Eighth Circuit. *See Hood v. United States* 342 F.3d 861, 864 (8th Cir. 2003) (finding district court sitting in the Eighth Circuit was bound to apply the precedent of the Eighth Circuit). This is well-established law. *See Calzone v. Summers*, 942 F.3d 415, 426 n.8 (8th Cir. 2019) ("In the absence of a controlling Supreme Court decision to the contrary, the district court as well as any panel of this court, was bound to apply this circuit's precedent."); *United States v. Wright*, 22 F.3d 787, 788

8

(8th Cir. 1994) ("[A] panel of this [c]ourt is bound by a prior Eighth Circuit decision unless that case is overruled by the Court sitting en banc."). It is settled that the Court is bound by the decisions in *Jackson*, *Cunningham*, and *Dunn*, and the Court must follow binding precedent. Thus, those decisions foreclose Defendant's constitutional challenge, and this Court recommends denying Defendant's request to dismiss Count Two of the Indictment.

### B. Motion to Suppress Evidence of Identification

Defendant moves for suppression of the show-up identification. *See* ECF No. 25; *see also* Def.'s Mem. in Supp., ECF No. 35. "The Due Process Clause protects against the admission of evidence derived from improper identification procedures." *United States v. Whitewater*, 879 F.3d 289, 291 (8th Cir. 2018) (citing *Neil v. Biggers*, 409 U.S. 188, 196 (1972)). "The Due Process Clause requires suppression of an eyewitness identification 'only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.'" *United States v. Scott*, 831 F.3d 1027, 1033 (8th Cir. 2016) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012)). Even then, suppression is not automatic. *Id.*; *see also Perry*, 565 U.S. at 239 ("Even when the police use such a procedure, . . . suppression of the resulting identification is not the inevitable consequence."). "Suppression will follow only where the evidence is unreliable." *Scott*, 831 F.3d at 1033.

Accordingly, courts "first determine whether the defendant has shown that the identification procedures were impermissibly suggestive." *Whitewater*, 879 F.3d at 291 (quotation omitted); *see, e.g.*, *United States v. Gilbert*, 721 F.3d 1000, 1006 (8th Cir. 2013); *United States v. Harris*, 636 F.3d 1023, 1026 (8th Cir. 2011). "Only if the photographic

9

lineup was impermissibly suggestive must [courts] proceed to analyze, under the totality of the circumstances, whether the impermissibly suggestive lineup created a likelihood of misidentification violating due process." *Harris*, 636 F.3d at 1026; *see also Perry*, 565 U.S. at 241 ("The due process check for reliability . . . comes into play only after the defendant establishes improper police conduct.").

Defendant relies on the Eighth Circuit's decision in *Clark v. Caspari*, 274 F.3d 507 (8th Cir. 2001) to argue that—similar to the identification process in *Clark*—the identification process in this case was impermissibly suggestive and therefore the show-up identification in this case should be suppressed. *See* Def.'s Mem. in Supp. at 3. In *Clark*, the Eighth Circuit found the circumstances surrounding the identification process to be coercive and thus improperly suggestive. 274 F.3d at 511. Prior to the identification in that case, two witnesses were asked to identify several suspects that police had apprehended; however, when they arrived on the scene only two suspects were present, and the witnesses watched one of the suspects "being hauled to his feet." *Id.* at 509, 511. Those two suspects were both handcuffed, surrounded by police officers, and one officer had his shotgun drawn. *Id.* at 511. The Eighth Circuit reasoned that the above circumstances suggested that the witnesses "may have felt obligated to positively identify [ ] [the two suspects], so as not to disagree with the police, whose actions exhibited their belief that they had apprehended the correct suspects." *Id.* Put differently, the Eighth Circuit concluded that the two witnesses "were given a choice: identify the apprehended suspects, or nobody at all." *Id.* The circumstances surrounding the identification of Defendant in this case do not rise to the level of being improperly suggestive as in *Clark*.

10

The evidence presented by the Government in this case lacks any coercive circumstances for this Court to find the show-up identification impermissibly suggestive. Leading up to the show-up, law enforcement repeatedly instructed the witness to give a *yes or no* response to whether she recognized the individual that *may or may not* have been involved in the fatal crash. Unlike in *Clark*, law enforcement did not indicate or suggest to the witness in any manner their belief that they had detained the correct suspect. Law enforcement even clarified to the witness that they had detained a *possible* suspect. While the witness did exhibit some uncertainty in her identification of Defendant at first and Officer Bady did seek clarification from the witness more than once, nothing in the record suggests that law enforcement pressured the witness to give a certain answer or suggest that law enforcement believed they had the correct suspect but only needed the witness to either "identify the apprehended suspect[ ], or no[one] at all." *Id.*

Further, the fact that Defendant was held in a squad car prior to the show-up identification and in handcuffs and surrounded by three officers during the show-up does not make the identification impermissibly suggestive. *See United States v. Pickar*, 616 F.3d 821, 828 (8th Cir. 2010) (finding show-up identification not suggestive where the possible suspect was handcuffed in between an officer in uniform and an officer in plain clothes, standing in front of a marked police car, with one of the officers shining a flashlight on the possible suspects face); *see also United States v. Martinez*, 462 F.3d 903, 911 (8th Cir. 2006) ("Necessary incidents of on-the-scene identifications, such as the suspect being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive." (quoting *Russell v. United States*, 408 F.2d 1280, 1284 (D.C. Cir. 1969)).

Defendant also challenges the reliability of the show-up identification. *See* Def.'s Mem. in Supp. at 4. Even if the show-up identification were impermissibly suggestive, however, it was still reliable and should not be suppressed. *United States v. Woody*, 690 F.2d 678, 680 (8th Cir. 1982) (finding show-up identification reliable and thus permissible despite being unduly suggestive). To decide the likelihood of misidentification, federal courts consider "the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *United States v. Williams*, 340 F.3d 563, 567 (8th Cir. 2003) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

Here, the witness initially observed from a short distance a person leaving the vehicle from the site of the fatal crash and then observed this same person from her deck running along her neighbor's yard. Shortly after her initial observation, the witness provided a description of this person to law enforcement which turned out to be a mostly accurate description of Defendant. Approximately a half an hour later the witness participated in a show-up identification. Prior to the show-up, during, and after, the witness was consistent in her description of the person she observed running away from the fatal crash: black male, six plus feet tall, white t-shirt, gray-green sweatpants, with shoulder length dreadlocks. She also observed this person limping while running from the fatal crash and during the show-up she observed Defendant limping which verified for the witness that Defendant was indeed the suspect she observed leaving the fatal crash. This verification eliminated any uncertainty or hesitation the witness had shown prior. These

12

facts support a finding that the witness's identification was reliable. *See Martinez*, 462 F.3d at 911 (finding show-up identification reliable when witness was given the opportunity to clearly observe the suspect, directly dealt with the suspect at the time of the offense, provided an accurate prior description of the suspect, exhibited certainty in identification, and only a short time between the offense and the identification had passed).

Defendant argues that law enforcement failed to develop details as to why the witness believed Defendant to be the driver of the vehicle that crashed into the sedan. *See* Def.'s Mem. in Supp. at 4. According to Defendant, this failure created a substantial likelihood of irreparable misidentification. *Id.* That detail is irrelevant for purposes of this issue before the Court, which is the reliability of the show-up identification. *See Williams*, 340 F.3d at 567. Furthermore, the show-up identification in this case was reliable because the witness had the opportunity to view the suspect almost immediately after the crash, the witness was mostly accurate in her prior description of the suspect, only a short time between the crash and the show-up identification had passed, and the witness also showed a high level of certainty in her identification of Defendant. *See Martinez*, 462 F.3d at 911. In sum, the show-up identification was not impermissibly suggestive but even if it had been, the show-up was reliable. Therefore, the Court recommends denying this motion.

### C. Motion to Suppress Statements

Defendant moves to suppress any statements he made following his arrest on the night of June 16, 2023. *See* ECF No. 26 at 1-2. Defendant specifically asks this Court to suppress any statements he made to law enforcement after his arrest, arguing that those statements were made without the benefit of his Miranda rights being read to him. *Id.* at 2.

13

In response, the Government asks this Court to deny this motion as moot because the Government does not intend to introduce in its case-in-chief any statements Defendant made to law enforcement from the time Defendant was handcuffed on the night of June 16, 2023, until he arrived at a hospital on that same night. *See* Gov't's Resp. at 6-7.

At the hearing, the Government reiterated its stance as to the mootness of this motion. Tr. 5:25-6:2. The Government clarified that it intends to use statements Defendant made prior to him being placed in handcuffs and any statements he made to other non-law enforcement personnel once he arrived at the hospital on the night of June 16, 2023. Tr. 6:2-7. The Government also clarified that it reserves the right to use statements Defendant made over the phone to his significant other while he was in the back of a squad car on the night of June 16, 2023, "but [the Government] wouldn't otherwise use statements from the times he was in handcuffs until he arrived at the hospital." Tr. 6:7-11. The Government also represented that Defendant was in agreement as to the mootness of this motion. Tr. 6:12-14. Defendant agreed with the Government's recitation of their agreement. Tr. 6:19-25. Defendant clarified that portions of Defendant's statements are not covered by his motion. Tr. 6:22-25. Therefore, based on the representations made by the Government and Defendant, the Court recommends that Defendant's motion to suppress statements be denied as moot. *See* Tr. 7:1-2.

### IV. RECOMMENDATION

Based upon the foregoing, and all files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Dismiss Count Two, ECF No. 23, be **DENIED**.

2. Defendant's Motion to Suppress Evidence of Identification, ECF No. 25, be **DENIED**.

3. Defendant's Motion to Suppress Statements, ECF No. 26, be **DENIED AS MOOT**.

Date: April 19, 2024

*s/ Tony N. Leung*
Tony N. Leung
United States Magistrate Judge
District of Minnesota

*United States v. Thompson*
Case No. 23-cr-358 (JMB/TNL)

# NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.