UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-358 (JMB/TNL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S TRIAL BRIEF** |
| v. | ) | |
| | ) | |
| DERRICK JOHN THOMPSON, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Assistant United States Attorneys Ruth Shnider and Thomas Calhoun-Lopez, hereby submits its Trial Brief in the above captioned case. Included in this memorandum are a summary of the facts the Government expects the evidence will establish at trial and briefing regarding motions in limine and other possible evidentiary matters.[1]

---

[1] The facts and inferences provided herein are not intended to be a full description of the Government's evidence or arguments in this case. It is provided to (1) inform the Court as to the factual allegations against the defendant; (2) facilitate the Court's consideration of motions in limine and arguments at the pre-trial conference; and (3) advise the Court as to the potential legal and factual issues during trial. In light of upcoming meetings with witnesses and defense filings, the Government respectfully reserves the right to supplement this trial brief or its motions in limine in advance of any pretrial conference, court hearing, or trial.

## I. OVERVIEW OF THE CHARGES & TRIAL

Defendant Derrick Thompson is charged by Indictment with three counts:

1. Possession with Intent to Distribute 40 Grams or More of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B);

2. Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8); and

3. Carrying a Firearm During and in Relation to a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

The case is set for a jury trial on Monday, October 7, 2024 in Courtroom 3A of the St. Paul courthouse. The Government estimates that its case-in-chief will take approximately three days.

The Government will be represented by AUSAs Ruth Shnider and Tom Calhoun-Lopez at trial. Mr. Thompson will be represented by Aaron Morrison and Matthew Deates of the Federal Defender's Office.

## II. THE ANTICIPATED FACTS AT TRIAL

On the evening of June 16, 2023, Trooper Andy Guerra of the Minnesota State Patrol was stationed in his marked squad on northbound I-35W near 46th Street. At about 10:10 p.m., Trooper Guerra's radar equipment clocked a Cadillac Escalade in the left lane travelling at about 95 miles per hour—far above the posted speed limit. Trooper Guerra pulled out and began attempting to catch up to the speeding Escalade. As the trooper gained ground, the Escalade abruptly cut across all four lanes of traffic, weaving around other

vehicles, and took the Lake Street exit.  Trooper Guerra followed the Escalade at the exit, but did not activate his lights or sirens; he did not want to attempt a traffic stop on city streets given the Escalade's dangerous driving.

Still about a block behind, Trooper Guerra then observed the Escalade fly through a red light at the intersection of Lake Street and Second Avenue and crash directly into a small Honda Civic that was lawfully crossing the intersection on a green light.  The trooper called for back-up and responded to the intersection.  As the trooper exited his squad, his body-worn camera captured several bystanders shouting and pointing, indicating that a black male in a grey or white shirt with dreadlocks had just fled the Escalade and run toward a nearby alley.

The Honda Civic was occupied by five young women who were killed instantly in the crash.  Surveillance video later collected from a nearby business (Sabri Properties) shows the Honda driving lawfully through the intersection, at a modest speed, with the green light—and the Escalade plowing into it.





A loud screeching can be heard and clouds of smoke appear. The Escalade rolls and comes to a resting place several yards from the smashed Honda. Owing to the smoke and the distance of the video, no one can be seen exiting the Escalade—even after an MPD video analyst attempted to further enhance and clarify the video.



Dozens of law enforcement officers and emergency personnel from multiple agencies responded to the intersection and crowds of onlookers formed. The scene was chaotic and, at times, emotional. Officers began taking statements from witnesses and attempting to locate the driver of the Escalade.

A witness with the initials D.P. lived in a house that faced the scene and was out with her dog when the crash happened. She told officers that she heard the crash, and then saw a black man who was over six feet tall running from the scene wearing a white t-shirt, gray or green sweatpants, and a skull cap with shoulder-length dreadlocks. The man ran along the path between D.P. and her neighbor's house and into the back alley. D.P. could see that he was limping.

Officers began canvassing the area and found the defendant, Derrick Thompson, seated in the parking lot of a Taco Bell on the south side of Lake Street, less than a block from the crash. Thompson, who is black, was wearing a white t-shirt with greenish camouflage print pants. He was over six feet tall, with dreadlocks to his shoulders. Thompson was sweaty and bleeding from his forehead and one of his hands. Officers asked Thompson about his injuries, and he initially claimed that they were old despite their obvious recency. He then told another officer that he had tripped and fallen nearby.

 

It did not take long for descriptions provided by eyewitnesses to be aired over the radio and for officers at Taco Bell to realize they were likely looking at the driver of the Escalade. Thompson was detained; once he began moving about it was readily apparent that he was injured and limping. Officers performed a "show-up" with witness D.P., and she confirmed that Thompson was the person

she saw running from the crash. Thompson was placed under arrest and then requested medical treatment, so he was taken to Hennepin County Medical Center (HCMC). Officers found over $2,000 in cash in Thompson's pocket.

Another witness, M.M., who had been at the crash scene, later contacted police and said he believed he had filmed a video on his cell phone that captured the driver who caused the crash. Officers collected the video from M.M., which shows Thompson limping across Lake Street toward the Taco Bell alone. Thompson asks M.M. for a ride, but M.M. declines.

An officer on-scene found a Hertz rental record for the Cadillac Escalade lying on the ground near the front passenger door. The renter name on the record was "Derrick Thompson." The record indicated that the Escalade had been rented at 9:46 p.m. from a Hertz located at the Minneapolis St. Paul Airport—approximately a half hour before the crash. Video obtained from Hertz shows Thompson and a second man (later identified as Thompson's brother) arrive at the Hertz in a black Dodge sedan. The video shows Thompson rent the Escalade, and the two men depart at about 9:46 p.m.: Thompson driving the Escalade, his brother driving the Dodge.





The Escalade was ultimately towed from the crash scene to the Minneapolis Police Department's evidence garage, where Sgt. David Ligneel

got a warrant to search it. On the front passenger floor, officers recovered a black leather bag that contained a loaded Glock handgun with an extended magazine, and various controlled substances, including over 2,000 blue pills containing fentanyl, about 14 grams of powdered fentanyl, about 35 grams of cocaine, and several assorted multi-colored pills.







MIDDLE POCKET

FRONT POCKET

Officers recovered a digital scale and a total of three cell phones from the Escalade. Officers also found indications that Thompson's brother was riding passenger in the Escalade at the time of the crash: a distinctive hat the brother was wearing at Hertz and keys to a Dodge were located in the vehicle when it was searched.

Thompson stayed at HCMC for a few days and was diagnosed with a hip fracture, for which he declined surgery, and then he was taken to jail. While at HCMC, Thompson expressed feelings of remorse about the crash to a nurse who treated him; he made it clear during the conversation that he had been

driving. Thompson denied to her, though, that he had been attempting to flee police when the crash happened.[2]

Various items of evidence were processed and analyzed for both fingerprints and DNA. Among the results were the following items where Thompson either matched to a major male DNA profile on the item, or where Thompson could not be excluded from a DNA mixture found on the item, with it being over 100 billion times more likely that Thompson was a contributor than not:

- The interior driver's side door of the Escalade;

- The grip and textured areas of the gun;

- The bag opening of the fentanyl powder; and

- The bag knot from the cocaine.

Thompson's fingerprints were found on the dashboard of the Escalade and on one of the cell phones found inside. A female DNA profile found in a spot of blood on one of the Escalade's airbags was matched to one of the deceased victims.

---

[2] HCMC medical records also contain a "Spiritual Care Note" that memorializes inculpatory statements Thompson made about the crash to a hospital chaplain. The Government does not intend to offer these statements in its case-in-chief. However, in the event Thompson testifies at trial and contradicts those statements, the Government believes they are fair game for cross-examination.

Thompson's brother's DNA was also compared against the DNA profiles recovered from the evidence. The brother was excluded from the DNA mixture found on the cocaine packaging, and did not match the major profile found on the fentanyl powder packaging (which Thompson did match to). The lab found very strong support that the brother was a contributor to the DNA mixture on the gun, and moderate support that he was a contributor to the mixture on the interior driver's door.

The three cell phones were extracted with search warrants. It is clear from the extracted data that at least one of them belonged to Thompson: various texts and accounts in Thompson's name appear on the phone, along with photos of him. The phone contains numerous messages about drug sales, including texts about "blues" (fentanyl pills) and "white girl" (cocaine), and a customer asking Thompson to "front" them drugs (provide them in advance of payment). In a voice note that Thompson sent to someone on June 12, 2023, he can be heard asking for "30K blues" and a "half" of something else. The other two cell phones also contained various texts about drug trafficking. One of those phones had pieces of identifying information for Thomson's brother; the third phone contained indications that both brothers used it for drug-trafficking purposes.

Also on Thompson's phones were multiple photos of him carrying the same bag the gun and drugs were found in:

 

As set forth in the briefing on motions in limine, Thompson was previously convicted of a remarkably similar set of offenses in California. In the fall of 2018, Thompson was driving a vehicle when he fled from police and struck a pedestrian, severely injuring her. Thompson then fled on foot, and over 8 kilograms of marijuana were found in the car. Thompson pleaded guilty in 2020 to Evading an Officer Causing Injury; Leaving the Scene of an Accident that Resulted in Permanent Injury; and Conspiracy to Possess Marijuana for Sale. He had been released from prison about six months prior to the instant offense.

## III.    THE GOVERNMENT'S EVIDENCE

The Government anticipates that its case at trial will broadly consist of the following categories of evidence:

- Testimony and BWC/squad video from the state trooper who first observed the speeding Escalade and followed it to where it crashed into the Honda Civic;

- Traffic camera footage of the Escalade speeding down I-35W and taking the Lake Street exit, as well as aerial video from Sabri Properties of the crash (both unenhanced and enhanced);

- Testimony and BWC from law enforcement officers who responded to the crash scene, located Thompson and connected him to the crash, participated in the eyewitness show-up, and ultimately placed him under arrest;

- Testimony from one or more lay witnesses who observed Thompson fleeing the crash;

- Video and records from Hertz showing Thompson as the renter and driver of the Escalade;

- Testimony and medical records from HCMC concerning Thompson's injuries and statements about the crash;

- Testimony and photographs from the MPD forensic lab regarding the Escalade's condition at the crash scene, and the items recovered during its later search at the evidence garage;

- Physical evidence, including various items found during the search of the Escalade (black leather bag, gun, drugs, scale, cell phones, etc.);

- Various exhibits of drug- and gun-related messages, images, and other items found on Thompson's cell phone, as well as the other two phones found in the Escalade;

- Testimony (both lay and expert) from forensic lab personnel at MPD and BCA who collected, examined, and analyzed DNA and fingerprint evidence, and connected various results to Thompson;

- An ATF interstate nexus expert to establish the out-of-state origins of the firearm;

- A drug-trafficking expert, to discuss topics such as indicia of drug-trafficking, the typical stream of commerce for fentanyl, the

meaning of drug slang found in text messages, and the relationship between drugs and firearms.

## IV.  GOVERNMENT'S MOTIONS IN LIMINE

### A.  MILs No. 1–4:  Omnibus Motion Regarding Self-Serving Hearsay, Sequestration, References to Punishment, and Prior-Act Evidence

The Government has filed an omnibus motion in limine addressing several matters that are standard requests prior to jury trials, and that the Government believes can help limit mid-trial disputes in the presence of the jury. The Government rests on the points and authorities set forth in that filing.

### B.  MIL No. 5:  Motion to Admit Bystander Statements as Present Sense Impressions and/or Excited Utterances

As captured on body-worn camera, when Trooper Guerra first arrived at the scene and jumped out of his squad car (seconds after the crash), multiple bystanders on the sidewalk started shouting at him and pointing up the street. There is lots of cross-talk on the BWC recording, but various statements of these bystanders can be made out, including "They went straight!" "They took off!" "Go to the alley!"  The trooper asks, "What's he wearing?" and bystanders can be heard responding something about "white" or a "gray sweater," and "he got locs" (dreadlocks).  The trooper asks "White male? Black male?" and a bystander replies, "Black male."  The Government moves to admit this excerpt of Trooper Guerra's BWC, including these bystander statements, because they

are admissible as present sense impressions and excited utterances under Fed. R. Evid. 803(1) and (2). The statements are also non-testimonial, and therefore do not implicate the Confrontation Clause, whether or not the declarants testify at trial.

The defense has indicated that it is possible they will not oppose this motion but has not yet confirmed their position. In the event the defense opposes this motion, the Government will submit the BWC clip at issue to chambers, prior to the pretrial conference.

### i. *Present Sense Impressions*

Rule 803(1) provides that "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is "not excluded by the rule against hearsay." Fed. R. Evid. 803(1). "The underlying rationale of the present sense impression exception is that substantial contemporaneity of the event and statement minimizes unreliability due to the declarant's defective recollection or conscious fabrication." *United States v. Manfre*, 368 F.3d 832, 840 (8th Cir. 2004). Statements made to police during or immediately following a crime are generally admissible under this hearsay exception. *See, e.g.*, *United States v. Dean*, 823 F.3d 422, 427-28 (8th Cir. 2016) (collecting cases and noting that 911 calls that are placed with "sufficient contemporaneity" are admissible under the present sense impression hearsay exception).

Here, bystanders were describing the person or persons they saw running from the Escalade within seconds of observing them. These statements were essentially contemporaneous with the events they described—even *more* so than a 911 call—and should be admitted as present sense impressions.

### ii. Excited Utterances

Rule 803(2) provides that "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" is "not excluded by the rule against hearsay." Fed. R. Evid. 803(2). The factors for determining whether a declarant is still under stress of excitement include the lapse of time between the startling event and the statement, whether the statement was spontaneous, and the event's characteristics. *See United States v. Phelps*, 168 F.3d 1048, 1054 (8th Cir. 1999). "For the excited utterance exception to apply, the declarant's condition at the time of making the statement must be such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation." *United States v. Clemmons*, 461 F.3d 1057, 1061 (8th Cir. 2006) (internal quotation omitted).

The bystanders' statements here were made within seconds of seeing a loud, catastrophic car crash a short distance from where the declarants were standing. The trooper arrived on-scene within seconds and, as can be discerned

from the bystanders' tone and demeanor, they were still very much under the stress of excitement from what they observed. The statements are thus admissible as excited utterances.

### iii. Confrontation

Finally, the statements do not implicate the Confrontation Clause because they are not testimonial. Statements to law enforcement are not testimonial hearsay where the primary purpose of the statements was to enable police to meet an ongoing emergency. *Michigan v. Bryant*, 562 U.S. 344, 377-78 (2011); *see also Davis v. Washington*, 547 U.S. 813, 822 (2006). "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Bryant*, 562 U.S. at 360.

Here, all the statements at issue were clearly elicited and made with the primary purpose of facilitating a response to an ongoing emergency, rather than creating a testimonial record for trial. When the trooper jumped out of his squad, he was responding to a devastating crash from which the perpetrator had fled. The primary purpose of his interaction with the bystanders was to enable law enforcement to locate a fleeing homicide suspect,

not to generate testimony.  There is no confrontation problem in admitting the statements.

**C.    MIL No. 6: Motion to Admit Facts from California Conviction Under Rule 404(b)**

In 2020, Thompson was convicted of multiple felonies for a remarkably similar series of events:  He was driving a car, in possession of a large quantity of controlled substances (8 kilograms of marijuana), and he was speeding. When a police officer attempted to pull him over, Thompson fled at a high rate of speed through a populated area, where he lost control of the vehicle and struck a pedestrian, gravely injuring her.  Thompson then fled from the vehicle on foot.  He ultimately pleaded guilty in California Superior Court to Evading an Officer Causing Injury; Leaving the Scene of an Accident that Resulted in Permanent Injury; and Conspiracy to Possess Marijuana for Sale.

The Government moves for admission of the basic underlying facts of Thompson's prior California convictions under Rule 404(b).[3]  The Government proposes proving these facts by way of a certified copy of Thompson's signed

---

[3]    Also potentially relevant, Thompson was convicted in 2015 for Carrying a Pistol Without a Permit, a gross misdemeanor.  But the Government does *not* intend to offer this conviction at trial.

stipulation of facts in support of his January 22, 2020 guilty plea in in California Superior Court. The relevant portion appears as follows[4]:

6. **FACTUAL BASIS FOR THE PLEA (addendum to 9b.(1)(g).).**

On 9/4/18, I did willfully and reckless drive a motor vehicle fleeing from law enforcement officers with activated lights and sirens with reckless disregard to public safety. While fleeing law enforcement was pursuing me, I recklessly struck a pedestrian,

I also did willfully and intentionally flee from the scene of the collision in order to escape liability for my actions. I also did willfully and intentionally possess 8 kilograms of marijuana for sale.

For the reasons set forth below, this evidence should be admitted on the issues of Thompson's identity as the driver of the Escalade, his motive in fleeing from the State Patrol at high speeds, and his knowing possession of the contraband in the vehicle.

Evidence is admissible under Rule 404(b)(2) if the act in question "(1) is relevant to a material issue; (2) is similar in kind and not overly remote in time to the crime charged; (3) is supported by sufficient evidence; and (4) its potential prejudice does not substantially outweigh its probative value."

---

[4]     The Government has proposed redacting the portion stating that the pedestrian suffered permanent brain damage and was in a coma for over two weeks.

*United States v. Banks*, 706 F.3d 901, 906-07 (8th Cir. 2013). The Eighth Circuit has consistently held that "Rule 404(b) is 'one of inclusion, such that evidence offered for permissible purposes is presumed admissible absent a contrary determination.'" *United States v. Williams*, 796 F.3d 951, 958 (8th Cir. 2015) (quoting *United States v. Wilson,* 619 F.3d 787, 791 (8th Cir. 2010)). A district court's decision to admit evidence under Rule 404(b) is reviewed under an abuse of discretion standard and will be reversed "only when the evidence 'clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.'" *United States v. Walker*, 470 F.3d 1271, 1274 (8th Cir. 2006) (quoting *United States v. Strong*, 415 F.3d 902, 904 (8th Cir. 2005)).

### i.   *Relevant to Material Issues*

To begin, the proffered evidence is relevant to the issue of Thompson's *identity* as the driver of the Escalade that fled from law enforcement on the night in question—and, inextricably, his *motive* in fleeing the trooper. A crucial dispute at trial will be whether Thompson was driving the Escalade and whether his reckless flight from the state trooper was evidence of "consciousness of guilt"—i.e., shows that he fled the trooper to avoid his drugs and gun from being discovered by law enforcement. In fact, in the days following the accident, while at the hospital, Thompson made statements to multiple people denying that he was fleeing from police, thus attempting to

counter the inference that he was engaged in illegal activity prior to the accident. Placing him in the driver's seat and proving the motive for his high-speed flight are thus central issues in the case.

"[I]f the conduct underlying the prior act and the current charged offense involved a unique set of 'signature facts,' then evidence of the prior act is admissible to show that the same person committed both crimes." *United States v. Almendares*, 397 F.3d 653, 662 (8th Cir. 2005). In order to admit such "identity" evidence, "the district court must make a threshold determination that a reasonable juror could find from comparing the acts that the same person committed both crimes." *Id.* Relevant to this determination are "the distinctiveness of the facts that make the crimes unique and the distance between the crimes in space and time." *Id.*

Here, the facts of both the current case and the prior act are unique and remarkably similar. On both occasions, Thompson was speeding and in possession of a distribution quantity of controlled substances. When approached by law enforcement for a traffic stop, he fled in a *highly* reckless and dangerous fashion. Plenty of suspects flee police; very few do so with such wanton disregard for safety that they repeatedly crash into innocent bystanders. Thompson's actions in both cases thus reveal a uniquely heightened state of panic about being caught in possession of contraband. And in both cases, Thompson then fled the scene of the accident on foot. The

California incident happened less than five years prior to the charged offenses, and Thompson was in prison for most of the intervening time.  The California evidence is thus relevant to the material issues of identity and motive for flight.

The California evidence, which involves Thompsons possession of a large quantity of drugs for distribution, is also relevant to the issue of Thompson's knowledge and intent: namely his knowing possession of the drugs in the Escalade.  Since the drugs in this case were not found in Thompson's actual possession, but at some distance from where he was arrested, in a vehicle that appears to have been occupied by two people, Thompson's state of mind with respect to the contraband will be central to the case.  "Where intent is an element of the crimes charged, evidence of other acts tending to establish that element is generally admissible."  *United States v. Adams*, 898 F.2d 1310, 1313 (8th Cir. 1989).  It is well established in this Circuit that prior instances of possessing and/or distributing drugs are relevant to show the defendant's knowing possession of the charged drugs and his intent to distribute them.[5]

---

[5]    *See United States v. Ironi*, 525 F.3d 683, 687 (8th Cir. 2008) ("[A] prior conviction for distributing drugs, and even the possession of user-quantities of a controlled substance, are relevant under Rule 404(b) to show knowledge and intent to commit a current charge of conspiracy to distribute drugs."); *United States v. Gaddy*, 532 F.3d 783, 789 (8th Cir. 2008) ("In light of a general denial, prior drug sale convictions are probative to show that Gaddy had the intent and knowledge necessary for a jury to convict him."); *United States v. Cook,* 454 F.3d 938, 941 (8th Cir. 2006) (stating that court has "frequently upheld the admission of prior drug convictions" to show intent when a defendant denies committing a drug offense).

For example, in *United States v. Foster*, 344 F.3d 799 (8th Cir. 2003), the defendant was charged with possession with intent to distribute a bag of crack cocaine that was found lying in the street near his car. *Id.* at 800-01. In affirming admission of the defendant's prior drug sale conviction under Rule 404(b), the Eighth Circuit explained that by denying any wrongdoing, the defendant was raising a general denial or "mere presence" defense that put his "intent or state of mind into question and allow[ed] the admission of prior criminal convictions to prove both knowledge and intent." *Id.* at 801. The court reasoned: "The government needed to prove that Foster possessed the drugs Officer Ehnes found, and part of that burden required a showing that Foster knew the drugs were in the bag and that he had the intent to control the contents of the bag. . . . The prior conviction therefore was relevant as proof of [those matters]." *Id.* at 801-02.

As *Foster* suggests, the use of Rule 404(b) evidence to show knowing possession of contraband is particularly appropriate where the Government proceeds, at least in part, on a theory of constructive possession. The Eighth Circuit reaffirmed this principle in *United States v. Green-Bowman*, 816 F.3d 958 (8th Cir. 2016), in the analogous circumstance of unlawful firearm possession. There, officers approached a car where the defendant sitting in the backseat on his cell phone. When one of the officers spoke to the defendant, he got out of the car, shut the door, and walked away, still talking on the phone.

24

A shotgun was found on the backseat near where he had been sitting. *Id.* at 961. Following the defendant's conviction at trial, the Eighth Circuit affirmed the admission, under Rule 404(b), of similar facts underlying the defendant's prior firearm conviction, where he had attempted to discard and disclaim possession of a backpack containing a gun. The court held that the facts of the prior conviction were "relevant to prove Green–Bowman knew about the shotgun next to him in the car and intended to possess it." *Id.* at 963. The court underscored: "[K]nowledge is often a key element of constructive possession. So proving possession itself also depended, in part, on proving Green–Bowman knew the shotgun was in the car." *Id.* at 963-964. Further, the court reasoned, given that one interpretation of the defendant's actions in the current offense was that he walked away from police simply because he didn't want to interrupt his telephone conversation, the Rule 404(b) evidence was relevant because it made that "innocent explanation for [the defendant's] behavior less likely." *Id.* at 964. The facts of the prior conviction "showed that on another recent occasion, when Green–Bowman had a gun he was not supposed to possess and was approached by the police with no way to get away, he did something similar—he distanced himself from the gun while acting like he was unaware of it." *Id.* at 964. "Knowing that historical context, a jury might see Green–Bowman's behavior in the parking lot differently. Maybe he

walked away not so he could talk in peace, but so the police would not find him next to the shotgun in the car." *Id.*

Although out of circuit, *United States v. Trent*, 443 F. App'x 860 (4th Cir. 2011) is also on point. There, the defendant was charged with unlawful firearm possession after an incident where he was the driver of a vehicle that fled police at a high rate of speed and crashed. The defendant and a passenger then ran away on foot, and a firearm was found on the passenger seat. *Id.* at 861. The Fourth Circuit affirmed the admission of two prior instances where the defendant threw firearms while fleeing police, concluding that it was relevant to the defendant's knowing possession of the charged firearm. *Id.* at 862. The court explained: "[I]n all three incidents, Trent drove recklessly, wrecked his vehicle, fled on foot from police, and then attempted to dispose of his firearm. Given these similarities, the prior incidents shed significant light on the issue of Trent's knowledge of the firearm ultimately found in the Taurus." *Id.* at 862. The court also noted that the defense at trial was that the *other* person in the car, not the defendant, was in possession of the gun: "Resolution of this issue turned on Trent's state of mind with respect to that firearm, of which the evidence describing Trent's previous acts proved particularly probative." *Id.* at 863.

The Rule 404(b) evidence in this case should be admitted for the same reasons as those in *Green-Bowman* and *Trent*. Here, any defense at trial will

necessarily assert that, even if Thompson was in the car, he was not in knowing possession of the bag containing the drugs and gun, and that any evidence that he fled from police (in the Escalade, on foot, or both) was for some other reason. Such a defense almost certainly involves a claim that the contraband in the vehicle belonged to someone else, and that Thompson was a mere unwitting companion. The events in California are directly relevant to rebut that claim and to assist the jury in interpreting Thompson's behavior and state of mind in this case: in California, Thompson behaved in a nearly identical fashion and ultimately admitted that he was in possession of a large quantity of drugs for sale. The "historical context" supplied by the prior case is directly relevant to show that Thompson was in knowing possession of the contraband here, he intended to distribute the drugs, and he fled from police because he was concerned he would get caught for the same.

### ii. Similar and Not Overly Remote in Time

Regarding the second prong, as already explained above, the evidence is abundantly similar in kind: the two incidents involve nearly identical plot beats. And the California incident is not overly remove in time: the events occurred less than five years prior to the instant offense. "[T]here is no fixed period within which the prior acts must have occurred," *United States v. Walker*, 428 F.3d 1165, 1170 (8th Cir. 2005), and the Eighth Circuit has upheld use of Rule 404(b) evidence in cases where the prior convictions were far more

remote. *See United States v. Green*, 151 F.3d 1111, 1114 (8th Cir. 1998) (listing permissible time boundaries as remote as 17 years, 13 years, and 12 years); *Walker*, 470 F.3d at 1275 (upholding admission of an 18-year-old conviction for armed robbery in a felon in possession case); *United States v. Strong*, 415 F.3d 902, 905-06 (8th Cir. 2005) (upholding admission of 16-year-old conviction for robbery and being a felon in possession of a firearm). The remoteness factor is further diminished in significance when accounting for the fact that the defendant was incarcerated from the time of the conviction until early 2023. *See Walker*, 470 F.3d at 1275 (noting that "it is '[a]n important circumstance' that [the defendant] was incarcerated" for 10 out of the 18 years before committing the instant offense). In sum, the convictions are "close enough in time to meet [the Eighth Circuit's] standards of reasonableness." *United States v. Stroud,* 673 F.3d 854, 861 (8th Cir. 2012).

### iii.    *Supported by Sufficient Evidence*

The evidence would be established by the defendant's own sworn admissions, so there are no concerns regarding sufficiency.

### iv.    *Prejudice Does Not Substantially Outweigh Probative Value*

Finally, the potential prejudice of the evidence does not substantially outweigh its probative value. The Government is not dismissive of the fact that both this case and the California incident ended in crashes that were

alarming and tragic. As with the parties' agreement that information concerning the June 16, 2023 crash can be limited to a short recording of the crash taken at a distance, and the high level information that "fatalities" were involved—the Government believes the outcome of the California crash could be described as simply that Thompson struck a pedestrian. However, the remaining facts about the crashes bear on the acts' similarity and thus their relevance: these crashes were the natural and probable consequence of Thompson's unusually reckless and panicked decision to flee from law enforcement to avoid detection for his drug-trafficking activities, and thus they go to the heart of the liability issues in this case. Rule 403 "does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. The rule protects against evidence that is *unfairly* prejudicial, that is, if it tends to suggest decision on an improper basis." *United States v. Jiminez*, 487 F.3d 1140, 1145 (8th Cir. 2007) (quoting *Wade v. Haynes*, 663 F.2d 778, 783 (8th Cir. 1981)). The Government believes it has proposed admitting information about both crashes that diminishes the risk of unfair prejudice while permitting the jury to hear highly probative evidence of the charged crimes.

Additionally, it is well established that "a limiting instruction diminishes the danger of unfair prejudice arising from the admission of the evidence." *Stroud*, 673 F.3d at 861 (quoting *Walker*, 470 F.3d at 1275) (noting

that a "district court's determination that the probative value of the evidence outweighed any prejudice is afforded substantial deference"); *United States v. Lucas*, 521 F.3d 861, 866 (8th Cir. 2008). At trial, Model Criminal Jury Instructions for the Eighth Circuit § 2.08 and/or § 2.09 can be given to the jury, along with any other cautionary instruction the Court deems appropriate, thereby significantly diminishing any risk of unfair prejudice. *See United States v. Paul*, 217 F.3d 989, 999 (8th Cir. 2000) (noting that juries are presumed to follow all instructions of the district court).

Finally, in the event the Court denies this motion as to the Government's case-in-chief, but the defendant then elects to testify, the Government believes that cross-examination regarding the California events should be permitted, as the probative value on issues such as knowledge and intent would be even further compounded at that juncture.

### D. MIL No. 7: Motion to Permit Impeachment of Defendant Under Rule 609

The United States seeks to introduce evidence of the defendant's following prior felony convictions for purposes of impeachment, pursuant to Federal Rule of Evidence 609(a)(1)(B), if the defendant chooses to testify at trial in this matter:

| Crime(s) of Conviction | Location of Conviction | Date of Conviction (on or about) |
|---|---|---|
| 5th Degree Drug Possession | Ramsey County, MN | 10/1/2015 |
| 1. Evading an Officer Causing Injury<br><br>2. Leaving the Scene of an Accident that Resulted in Permanent Injury<br><br>3. Conspiracy to Possess Marijuana for Sale | Santa Barbara County, CA | 2/4/2020 |

Rule 609(b) establishes a presumptive ten-year period of admissibility that runs from the date of conviction, or from the time the witness was released from confinement for the convictions, whichever is later. *See United States v. Stoltz*, 683 F.3d 934, 939 (8th Cir. 2012) (stating "the [ten-year] clock starts at the witness's release from any physical confinement, or in the absence of confinement, the date of conviction"). For both convictions listed above, the date of conviction is within the permissive 10-year period.

Federal Rule of Evidence 609(a)(1)(B) provides that evidence of a felony conviction "must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant." Fed. R. Evid. 609(a)(1)(B). The Eighth Circuit has long held that "prior convictions are highly probative of credibility 'because of the common sense proposition that one who has transgressed society's norms by committing a felony is less likely than most to be deterred from lying under

oath.'" *United States v. Collier*, 527 F.3d 695, 700 (8th Cir. 2008) (quoting *United States v. Chauncey*, 420 F.3d 864, 874 (8th Cir. 2005)).

Because the defendant's possession of the drugs and firearm will essentially be the sole issues at trial, the defendant's credibility will be a key factor in the jury's determination of the facts, should he elect to testify. If the defendant testifies, he will likely attempt to contradict the narrative told by Government witnesses about his role in the crash, his relationship to the contents of the Escalade, the meaning of the information on his cell phone, and other critical pieces of evidence. This will put the credibility of his trial testimony squarely in issue. The Eighth Circuit has confirmed that cross-examination regarding felony convictions is more probative than prejudicial when credibility is a central issue. *United States v. Crawford*, 130 F.3d 1321, 1323 (8th Cir. 1997) ("Credibility was at the heart of the jury's factfinding responsibility since possession was the critical issue. The probative value of the evidence was therefore significant . . . .); *United States v. Brown*, 956 F.2d 782, 787 (8th Cir. 1992) (noting that credibility is a "critical factor in the jury's choice" when the "jury essentially had to choose between one version of events presented by the government's witnesses and another version presented by the defendant's"). This is particularly the case where the jury will have to weigh one witness's credibility against another. "'[W]here the credibility of one witness must be weighed directly against that of another, the probative value

of a prior conviction may well be enhanced, rather than diminished.'" *United States v. Holmes*, 822 F.2d 802, 805 (8th Cir. 1987) (quoting *United States v. Spero,* 625 F.2d 779, 781 (8th Cir. 1980)).

Moreover, the Court can further minimize any prejudicial effect by providing a limiting jury instruction. *See* Manual of Model Criminal Jury Instructions for the Eighth Circuit, § 2.16.

For the foregoing reasons, should the defendant testify, his prior convictions identified above are highly probative of his credibility, outweighing any unfair prejudicial effect. Therefore, the United States respectfully requests the opportunity to cross-examine the defendant regarding the above-listed felony convictions should he testify.

## E.    MIL No. 8:    Motion to Preclude Expert Testimony Regarding Unrelated Cases

The Government moves to preclude Thompson from offering evidence of unrelated, past cases where individuals were arrested based on DNA evidence but were ultimately not convicted. This evidence is inadmissible for three reasons: 1) it is irrelevant; 2) it consists of inadmissible hearsay; and 3) it is barred by Fed. R. Evid. 403.

Thompson provided notice to the Government that he intends to call as a witness Cynthia Cale, who Thompson indicated will testify generally to the unreliability of DNA testing by the BCA where siblings are involved; Ms. Cale

will also testify regarding DNA transference broadly. Thompson notice included the following:

> Ms. Cale will also testify about the case of Lukis Anderson in California, who was arrested for murder in 2012 after paramedics tried to resuscitate a murder victim. Law enforcement obtained Mr. Anderson's DNA profile from fingernail scrapings obtained from the victim. It was later determined that DNA had transferred from Mr. Anderson to the paramedics during an unrelated event and, when the paramedics subsequently went to the scene of the murder to try to resuscitate the victim, Mr. Anderson's DNA transferred to the victim. Mr. Anderson was eventually released and charges dropped after it was shown he has never been in the victim's vicinity. Likewise, Ms. Cale will testify about a similar case in Australia, where Farah Jama was arrested on an unrelated matter and a DNA sample was taken. The person who handled Mr. Jama's DNA sample later handled a swab taken from a victim of sexual assault. This contaminated the DNA swab from the victim, and Mr. Jama was charged with committing the assault before eventually being exonerated when it was established that Mr. Jama had never been near the victim.

The Government moves to exclude the testimony outlined above.

The evidence is irrelevant. "Evidence is relevant if it has any tendency to make a fact of consequence in determining the action more probable or less probable than it would be without the evidence." *United States v. Roubideaux*, 112 F.4th 606, 613 (8th Cir. 2024), citing Fed. R. Evid. 401 (internal parentheses omitted). Here, the fact that prior law enforcement officers in unrelated cases (and in the Farah Jama case in another county) may have arrested someone based on DNA evidence that did not ultimately result in a conviction is not relevant. Law enforcement officers in those cases may (or may

not) have made investigative mistakes that led to the transference of an arrestee's DNA. The actions of those officers have no relevance or bearing on the actions of the law enforcement officers in this case.

The testimony also consists of inadmissible hearsay. An expert may *rely* on otherwise inadmissible hearsay in forming his or her opinion. *United States v. Lopez*, 880 F.3d 974, 980 (8th Cir. 2018), citing Fed. R. Evid. 703. But experts are not given license to narrate entire accounts (prior cases that the expert has only read about) to the jury as if the witness had first-hand knowledge. The Rules of Evidence do not allow Ms. Cale to outline the facts and circumstances of two prior, unrelated cases that Ms. Cale has read about or been told. And even the rule allowing experts to rely upon hearsay in forming their opinions requires that the hearsay consists of "facts and data . . . of a type reasonably relied upon by experts in [the expert's] field." *Lopez*, 880 F.3d at 980. In this case, the two prior accounts of cases are anecdotes—Thompson has not shown that they are facts and data relied upon by experts in the DNA field. And even if they were, Rule 703 requires that for inadmissible facts underlying an expert's opinion to be disclosed to the jury, their "probative value in helping the jury evaluate the opinion" must "substantially outweighs their prejudicial effect." For the reasons below, this standard is not met here.

Even if the accounts were otherwise admissible, the testimony is barred by Fed. R. Evid. 403. Under this rule, evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Id.* Ms. Cale's testimony regarding these two prior, unrelated cases is barred by this rule. The testimony would confuse the issues by focusing the jury's attention on the practices and procedures of past, unrelated law enforcement agencies. It would mislead the jury by suggesting without basis that innocent people are regularly falsely arrested. And the testimony would result in "mini-trials" where the guilt or innocence of unrelated parties was either established or rebutted.

The Government was unable to find federal cases where parties attempted to elicit testimony regarding the Anderson and Jama arrests—a telling point in and of itself. However a district court in the Northern District of California did address a habeas petition by a defendant convicted in state court who was barred from cross-examining on, introducing evidence of, and arguing the Lukis Anderson matter. *Howell v. Keeton*, No. 16-05877 BLF (PR), 2018 WL 10455908 (N.D. Cal. Apr. 3, 2018). In that case, the district court had no trouble finding that the defendant was not entitled to relief. *Id.* The *Howell* Court found that the state court's decision to preclude the defendant from

discussing the Anderson case was reasonable: it was irrelevant, conjectural, and would have misled the jury. The same analysis applies in this case.

## V.    OTHER EVIDENTIARY MATTERS

### A.    Felony Stipulation / Records

The parties anticipate executing and filing a stipulation (under *Old Chief v. United States*, 519 U.S. 172 (1997) and *Rehaif v. United States*, 139 S. Ct. 2191 (2019)) that Thompson had been convicted of a felony and knew as much at the time of the offense. The Government intends to mark and offer this stipulation in evidence.

In the event the defendant changes his mind and decides not to stipulate to his felon status, the Government intends to introduce records and testimony concerning felony convictions listed in its Rule 609 motion. In addition, because *Rehaif v. United States*, 139 S. Ct. 2191 (2019), now requires that the Government prove that the defendant *knew* he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, in the absence of a stipulation, the Government's evidence would include references to the length of the sentences imposed in these cases—since in all of them, the sentence in fact exceeded one year in prison.

### B.    Contextual Information Concerning the Car Crash

The parties have met and conferred about their respective positions on the amount of information that should be shared with the jury regarding the

car crash that took place on June 16, 2023. As of this filing, the parties are in agreement that the Government may show the Sabri Properties video of the crash, and witnesses may mention that it involved "fatalities." The Government agrees that it will not introduce testimony or evidence concerning the number of victims, or their personal biographies – other than the fact that at least one was female, given that female victim DNA was found in a spot of blood on the Escalade's airbag.

The only potential exception to this agreement is that if the defense demands that the Government prove chain of custody on the victim DNA samples, the Government will necessarily have to introduce the fact that there were five of them, in order to show labeled and initialed envelopes with the DNA swabs that demonstrate the chain. The Government has proposed to defense that the parties stipulate to chain of custody on the victim known samples (among other things) and has not yet received a response.

In the event the Government believes that, during trial, the defense has opened the door to more information concerning the crash, the Government will first raise the issue outside the presence of the jury.

## C.    Chain of Custody / Efficiency Matters

The parties have been meeting and conferring in an effort to streamline testimony for trial. For example, the Government learned that the BCA scientist who swabbed the drug packaging for DNA had international travel

plans during the week of trial; given her very limited role, the defense has agreed not to object to her absence at trial. Instead, the primary DNA analyst will describe the general procedures for swabbing drug packing.

The Government has made additional proposals for streamlining what it believes to be uncontroversial aspects of the chain of custody on certain items and is awaiting the defense's response.

**D.     Self-Authenticating Records under Fed. R. Evid. 902(11)**

On September 3, 2024, the Government notified the defense regarding its intention to offer the following as self-authenticating business records and video under Rules 902(11) and 902(13):

- MN Department of Transportation traffic camera footage of I-35W;

- Rental records and video from Hertz;

- Video of the crash from Sabri Properties; and

- Defendant's HCMC medical discharge summary.

Signed certificates of authenticity have been produced to the defense for all of the above items. On September 12, 2024, the Government also notified the defense that it is in the process of obtaining a certificate of authenticity for surveillance video taken at the Minneapolis-St. Paul airport (produced), and that one or more clips of that video will be likewise offered as self-authenticating records. The Government has not received any objections from the defense to the authenticity of any of these materials.

The Government notes that it expects to add certain demonstrative indicators to assist the jury in its review of some of the video records—for example, colored arrows to indicate the Escalade and the Trooper vehicles on the I-35W footage; corrected time-stamps on the Hertz video surveillance (the native time-stamps are approximately 14 minutes off). A testifying witness will lay foundation for these markings. The Court has broad discretion to admit demonstrative exhibits, and should do so here, particularly given the non-argumentative nature of the markings to be added to the authenticated videos. *See, e.g.*, *United States v. Fechner*, 952 F.3d 954, 960 (8th Cir. 2020) (court has broad discretion to admit demonstratives); *United States v. Two Elk*, 536 F.3d 890, 905 (8th Cir. 2008) ("Demonstrative exhibits may be admitted, at the trial court's discretion, as educational tool[s] for the jury.").

### E.    Transcripts

The Government intends to play a transcript alongside certain media exhibits that contain witness statements. The Government anticipates providing proposed transcripts to defense counsel in advance of trial with the goal of reaching agreement. *See United States v. Gonzalez*, 365 F.3d 656, 660 (8th Cir. 2004) ("[W]e believe that whenever the parties intend to introduce a transcript at trial, they should first try 'to produce an 'official' or 'stipulated' transcript, one which satisfies all sides"). In any event, the Government

intends to use the transcriptions to aid the jury in court, but not to provide copies during deliberations.

Dated: September 16, 2024

Respectfully submitted,

ANDREW M. LUGER
United States Attorney

*/s/ Ruth Shnider*
RUTH S. SHNIDER
THOMAS CALHOUN-LOPEZ
Assistant U.S. Attorneys